IRENE MATHEWS v. THE ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY.

No. 10795.

RAILROADS — *Injury to Passenger* — *Liability of Connecting Lines.* Where one railroad company, owning most of the stock of another railroad company and being desirous of utilizing it as a connecting line for through business, enters into a through-traffic agreement with it, by the terms of which a division of earnings on such traffic is stipulated, and matters pertaining to through

rates and other like business are entrusted in great part to the management of the former company, which upon its part undertakes to guarantee the bonds and generally to finance the affairs of the latter company, but the latter company retains the entire management of its own train service and operating department, employs, controls and discharges its own employees, and pays the expenses of such department, *held*, that, as to a passenger riding over the line of the latter company, upon a through ticket sold by the other company, containing a clause limiting responsibility for injuries *en route* to those occurring on the line of such company, damages cannot be recovered from the selling company for injuries received upon the line of the other through the negligence of its employees.

Error from Wyandotte court of common pleas; W. G. HOLT, judge. Opinion filed December 10, 1898. Affirmed.

*George W. Littick, T. P. Anderson,* and *Ben. S. Henderson,* for plaintiff in error.

*A. A. Hurd,* and *Mills, Smith & Hobbs,* for defendant in error.

The opinion of the court was delivered by

DOSTER, C. J.: This was an action for damages against the Atchison, Topeka & Santa Fe Railroad Company for injuries received on the line of the Atlantic & Pacific Railroad Company on account of the alleged negligence of the latter. The question for determination is whether or not there was such identity of interest or other character of relationship between the two companies as to make the former liable for the torts of the latter. Upon this question a number of written instruments — traffic agreements — to which the two companies and others were parties, were introduced in evidence, and in addition quite an amount of oral testimony explanatory of the action taken by the companies under and in pursuance of the traffic

agreements was introduced, showing the practical interpretation of the agreements made by the several parties thereto.    Elaborate findings of fact were made by the court below, which we have read, together with the documentary and oral evidence.

Stated in quite brief terms, though with sufficient fulness to disclose all pertinent matter, the facts are as follows : The Atchison, Topeka & Santa Fe and the St. Louis & San Francisco railroad companies both have lines projected and partially completed to the Pacific coast, that of the former terminating at Albuquerque, N. M., and that of the latter at a point on the line of the former in the Arkansas valley in Kansas.    The Atlantic & Pacific Railroad Company has a line beginning at Albuquerque, N. M., and extending, partially by construction and partially by the lease of another line, to Barstow, Cal., where connection is made with another road to San Francisco and other points on the coast.    The line of the Atlantic & Pacific Railroad Company furnishes to the Atchison, Topeka & Santa Fe and the St. Louis & San Francisco companies the shortest and most desirable route for through traffic to the Pacific coast, and they were desirous that it should extend its road to the coast in order to accommodate the through traffic they were able to secure.    Therefore they bought and held seven-eighths of its stock, and, together, they undertook to finance its affairs by guaranteeing its bonds and maintaining it in a solvent condition.    The agreements referred to set out in detail the schemes agreed upon for upholding its credit and managing its finances.    They provided for divisions of earnings upon through business and for the application of the earnings of the Atlantic & Pacific Railroad Company to the payment of the obligations guaranteed by the

other companies. They also provided for financing the affairs of the one company under the management and in the interest of the other two companies to the end of securing them against loss on their guaranty of its bonds.

The primary object of these agreements appears to be the mutual benefit of the three companies through an interchange of traffic, and, as a means to that end, the upholding of the credit of the Atlantic & Pacific Railroad Company and its maintenance in a solvent condition as an independent company. None of these agreements seems to have or to seek the effect of merging the actual existence of the Atlantic & Pacific Railroad Company into those of the other two, or seems to have or to seek the effect of reducing the one to the character of a nominal corporate entity, or seeks to establish relations of principal and agent between the several companies or relations of partnership between them in the profits and losses of the business of railroading. They seek and seem only to have the effect of putting the finances of the one under the control and management of the others to the end and for the purpose stated. None of these agreements provides for the control or management of the operating department of the Atlantic & Pacific Railroad Company by the others, except that in some particulars the adjustment of time-cards and train schedules was made to devolve upon the others. The employment, supervision and discharge of employees of the Atlantic & Pacific company and the payment of the expenses of the operation of its line from Albuquerque to its western terminus were left to the managers of its own operating department, except that by one of the agreements some of the employees at Albuquerque and, to an extent, the terminal yards at

that station were placed under the control of the Atchison, Topeka & Santa Fe management.   By the terms of one of the agreements it was stipulated as follows :   '' The western division of the Atlantic & Pacific railroad shall be under the management of the Atchison company.''   By another stipulation it was agreed :   '' The central division of the Atlantic & Pacific railroad shall be under the management of the San Francisco company.''   However, the context of this agreement shows that the language quoted refers not to the train service or the operating department of the Atlantic & Pacific company, but to its management in respect to rates and traffic arrangements generally.   The quoted provisions, read in full, show that they were inserted for the purpose of securing equality of right between the Atchison, Topeka & Santa Fe and the St. Louis & San Francisco companies in respect to rates, and to prevent discrimination by the Atlantic & Pacific company against either of the other companies, and not to confer upon either of them any supervision over the operating department of the Atlantic & Pacific company.

On the 3d day of January, 1893, the plaintiff in error purchased of the agent of the Atchison, Topeka & Sante Fe Railroad Company at Kansas City, Mo., a through round-trip coupon ticket from that station to San Francisco and return.   The coupons called for passage over the Atchison, Topeka and Santa Fe, the Atlantic & Pacific, the California Southern and the Southern Pacific railroads.   This ticket, as is usual in such cases, contained a contract for passage made up of various stipulations, one of which was in the following language :   '' In selling this ticket for passage over other roads this company acts only as agent, and assumes no responsibility beyond its own

line." It concluded with an agreement in the following language : "In consideration of the reduced rate at which this ticket is sold, I hereby agree to accept all the provisions of the above contract." This was signed by the plaintiff in error as purchaser. Starting upon her trip she went aboard a car called a "tourist sleeper," owned by the Pullman Palace Car Company, but which the defendant in error and its connecting lines were in the habit of using for transportation of their through passengers without change. At a point on the line of the western division of the Atlantic & Pacific railroad she was injured by the negligence of the employees of that road. She sued the Atchison, Topeka & Santa Fe Railroad Company for damages on account of the injuries received by her, and, as before stated, the question relates, under the facts above set forth, to the liability of the one company for the negligent acts of the other. The court below held against her right of recovery, and from its judgment she prosecutes error to this court.

Her claim of error, however, is unavailing. In *A. T. & S. F. Rld. Co. v. Roach*, 35 Kan. 740, 12 Pac. 93, it was held :

"The sale of a through ticket for a single fare by a railroad company to a point on a connecting line, together with the checking of the baggage through to the destination, is evidence tending to show an undertaking to carry the passenger and baggage the whole distance, and which, in the absence of other conditions or limitations and of all other circumstances, will make such carrier liable for faithful performance and for all loss on connecting lines the same as on its own."

In this case, however, in addition to those elements of the transaction which, as above stated, evidence a contract of liability for through passage, the conditions, limitations and other circumstances show that

a contract of liability for through passage was not
entered into by the defendant company.  The contract
for passage itself, that is, the ticket, in plain terms
disavows responsibility for the acts and conduct of the
connecting lines, and limits the responsibility of the
defendant company to passage over its own line.  We
do not wish to be understood as holding that the ac-
ceptance of this contract of passage and the signature
of the plaintiff in error to its terms of necessity re-
lieved the defendant in error of liability.  Tickets such
as the one in question are in stereotyped forms pre-
pared by the companies themselves.  The passenger
must purchase or refrain from the contemplated
journey.  The terms of the agreement of passage cannot
be negotiated for by the passenger.  They must be ac-
cepted as proposed by the company itself.  As a rule,
these tickets, with their incident stipulations of lim-
ited liability for passage, are not read by the passen-
ger before purchase, nor do time and opportunity
exist for reading them.  They are imposed by the
company upon the passenger as a condition to the
transportation facilities desired.  If they contain no
illegal or exceptionally onerous conditions violative
of the obligations of the carrier, the passenger will be
bound by their terms ; otherwise, not.  In this case
the question as to whether or not the ticket or con-
tract of passage was one which the company might
lawfully impose, and by which the passenger would
be bound, has not been raised, nor do we mean to in-
timate that it could be successfully raised.  We desire
simply to prevent misconception of the statement
made by us that, the contract of passage being in this
case unlike the one in the case of *A. T. & S. F. Rld.
Co. v. Roach*, supra, and being, as it was, a contract
of limited liability, the plaintiff in error can claim

nothing upon the mere ground of the purchase of a through ticket over several connecting lines.

In the case of Roach it was stated that arrangements in the form of traffic agreements might be made and frequently were made between companies owning connecting lines which would constitute them partners as to third persons, and this is undoubtedly true, but we are unable to view the agreements entered into between the defendant in error and the Atlantic & Pacific Railroad Company as a partnership arrangement as to patrons of their connecting roads. There was not that merger of different interests, that blending of different individuals into a whole for the attainment of a single purpose and object, that mutual sharing of burdens and benefits, which constitute a partnership. This conclusion, however, cannot be argued out in view of the prolix and technically worded traffic agreements before mentioned without extending this opinion to great length. The facts as we have stated them are generalizations, correctly drawn, as we believe, from the oral evidence and from the many pages of matter which these various agreements contain. We attach much importance to the fact that the Atlantic & Pacific Railroad Company retained in these agreements the management of its own operating department. It was through the negligence of the employees of that particular department that the injuries of the plaintiff in error were received. Cases may occur in which the potential existence of one railroad company is so nearly absorbed in or dominated by that of another company that the maintenance by them of separate organizations, or separate operating departments within their respective organizations, becomes a mere fiction, but this case, under the facts stated, is not one of that kind.

Mathews v. Railroad Co.

No great weight, in our judgment, is to be attached to the fact that the Atchison, Topeka & Santa Fe Railroad Company was a large stockholder in the Atlantic & Pacific company, or was the guarantor of its bonds. Such facts may constitute controlling reasons in the judgment of the management of the two companies for entering into close traffic agreements, but they do not of themselves constitute reasons for holding the two companies to be partners, or one company to be the servant or agent of the other. In the case of *A. T. & S. F. Rld. Co. v. Davis*, 34 Kan. 209, 8 Pac. 530, it was held :

" Where a great railroad company, operating a long line of road in the state, aids, as stockholder or bondholder, or as the guarantor of bonds, another railroad company in constructing its road, under the provisions of chapter 105, Laws of 1873, such auxiliary company does not become, on account of such aid, the servant or agent of the parent company ; and the parent company is not, on account of being such stockholder or bondholder or guarantor of bonds, responsible for the negligence or other default of the auxiliary company in constructing its road in its own name."

The principle involved in this decision applies in the determination of the point in question. If the one company cannot be held liable for the negligence of the other in constructing its road, it cannot, for the same reason, be held liable for its management or operation.

The judgment of the court below is affirmed.